UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No: 0:21-cv-61148-RAR

MICHAEL SILVER,

      Plaintiff,

v.

CITY OF PEMBROKE PINES,
A MUNICIPAL CORPORATION AND
POLITICAL SUBDIVISION OF THE
STATE OF FLORIDA

      Defendant.

_____/

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, MICHAEL SILVER, by and through his undersigned counsel, sues the Defendant, CITY OF PEMBROKE PINES, and alleges as follows:

## JURISDICTION AND VENUE

1.    This is an action for damages and to remedy violations of the rights of MR. SILVER under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and the Florida Civil Rights Act of 1992, as amended ("Chapter 760"), to redress injuries done to him by the Defendant, CITY OF PEMBROKE PINES ("Defendant").

2.    The unlawful acts which gave rise to this Complaint occurred within Broward County, Florida during the Plaintiff's employment with Defendant, making venue proper in this District pursuant to 28 U.S.C. § 1391.

## PARTIES

3.    At all times material hereto, Plaintiff has been a citizen and resident of Broward County, Florida and is otherwise *sui juris*.

1

4.      At the relevant times, Plaintiff was a homosexual, Jewish man, and, as such, Plaintiff is a member of a protected class under Title VII and Chapter 760 because the terms, conditions, and privileges of his employment were altered because of his gender and religion.

5.      Defendant is a government agency. At all times material hereto, Defendant was Plaintiff's employer as defined by law.

6.      Defendant has, at all times material hereto, employed 15 or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year.

7.      Plaintiff has exhausted his administrative remedies by filing a timely charge of discrimination against the Defendant with the Equal Employment Opportunity Commission, which was dually filed with the Florida Commission on Human Relations.

8.      Plaintiff's charge was filed within 300 days after the first instance of discrimination occurred.

9.      Plaintiff was issued a Notice of Right to Sue on March 3, 2021. This suit is filed in accordance with that Notice and within the applicable ninety (90) day limitation (a copy of the Notice is attached hereto as Exhibit "A").

10.     The Florida Commission on Human Relations did not issue a finding on Plaintiff's charge within 180 days of the filing of said charge.

### GENERAL ALLEGATIONS COMMON TO ALL COUNTS

11.     Defendant hired Plaintiff as a police officer in August 2003. The Defendant promoted the Plaintiff to detective in 2012.  In December 2019, Defendant demoted the Plaintiff back to police officer, and Plaintiff holds that title today.

12.     As a police officer, Plaintiff's primary duties and responsibilities include road patrol and responding to calls for service. When the Plaintiff was a detective, his primary roles and

responsibilities including being a detective in the Special Victims Unit ("SVU"), being a task force officer with the South Florida Internet Crimes Against Children Taskforce ("ICAC"), being an instructor, traveling to conferences, and giving seminars.

13.     Plaintiff was qualified for his various positions, with the last being, police officer, based on his experience and training.

14.     The Defendant was aware that the Plaintiff was a homosexual Jewish man, and this caused the Defendant to discriminate against him and ultimately demote him.

15.     During the Plaintiff's 18 years of employment, he has dedicated more than 7 years to the SVU, and he was instrumental in the creation of the ICAC and the Defendant's Digital Forensic Unit, which has been extremely successful in the modernization of the Defendant's operations. The Plaintiff received the 2018 South Florida's Shomrim Society's public servant of the year award, the 2018 Mayor's Proclamation, the 2017 citation for service issued by the Broward County Crime Commission, the 2013 Detective of the Year Award, the 2014 ASIS Award, and the 2012 Detective of the Year award issued by the Broward Domestic Violence Council. The Plaintiff was also the recipient of the medal of valor related to a shooting incident. Since the Plaintiff joined SVU, he became an expert in the field of cyber-crimes as it relates to child exploitation. The Plaintiff was invited to lecture at the Dallas National Crimes against Children Conference and the Florida National Internet Crimes against Children Conference. He was also called as an expert witness for the Broward County State Attorney's Office and was previously interviewed by CBS as an expert in cyber-crimes. As such, his reputation has been cemented as a dedicated and well-versed investigator amongst other government entities outside of the Defendant. Further, the Plaintiff has received nothing but positive feedback from his superiors through his latest evaluation, dated September 4, 2019.

16.     In 2018, the majority of the Defendant's command staff, including the Chief of Police, retired.  This meant that the department was headed by new command staff.  Chief Kipp Shimpano became the Chief of Police and Captain Chris Stasio was promoted from Captain to Major. Both men are straight and non-Jewish. From the outset of their promotion, there was an immediate shift in morale amongst the rank-and-file employees.

17.     The Plaintiff came out as homosexual in 2006. Being homosexual is associated with femininity. The Defendant treats homosexual men as if they are women. The old command staff treated the Plaintiff well but as soon as the new command staff came in, the Plaintiff was talked down to, continuously criticized, and was not taken seriously.  There were no other changes in Plaintiff's employment from 2018; meaning the only change was the command staff. Plaintiff continued to perform his job duties as he always had and for which he was consistently honored.

18.     The Defendant first targeted the Plaintiff in the fall of 2018 after his nomination for the Man of the Year Award from the South Florida Shomrim's Society for his work in protecting children as an SVU/ICAC detective. Major Stasio repeatedly harassed and questioned the Plaintiff about the award and the command staff later refused to attend the award ceremony. Major Stasio condescendingly said, "who gave you this award?" as if to say the Plaintiff did not deserve the award. During the award ceremony, Major Stasio criticized and informally reprimanded the Plaintiff because during the event, a slideshow played pictures of the Plaintiff in uniform with visible tattoos. After the ceremony, Major Stasio came up to the Plaintiff and questioned him on the tattoos. The Plaintiff had to explain that he was grandfathered in since he had the tattoo before the implementation of the policy forbidding visible tattoos in uniform. So instead of being celebrated for his achievements, the Defendant opted to ignore and then criticize the Plaintiff.

19.     In May 2019, after being asked to help with a runaway child, the Plaintiff was unable to acquiesce to the demands of the mother, which were unrealistic, unlawful and not in compliance with past practices. Essentially, the mother was demanding the case be investigated over a longer period of time despite offering no additional information, and in fact withholding valuable information in order to try to give the case higher priority. When the Plaintiff expressed his concerns with the investigation to Sergeant Angela Goodwin, he was accused of violating general orders. There were no other detectives with the Defendant that were subjected to the same treatment.

20.     Shortly thereafter, the Plaintiff was summoned to Sergeant Andres Lopez's office at the request of Sergeant Goodwin. Once inside the office, Sergeant Goodwin began to counsel the Plaintiff on his response to investigating the case. During that meeting, the Plaintiff was accused of being disrespectful, refusing to do his job, not updating superiors properly, and not responding to texts in a timely manner while off duty and not on call. However, per the Plaintiff's contract, he was not obligated to respond to email or texts unless on duty or on call. The Plaintiff indicated that he did not agree with the allegations and he felt that his policeman's bill of rights was not being properly followed. The Plaintiff demanded legal representation and that a higher-ranking official be present. Sergeant Goodwin warned the Plaintiff that he would regret it if he were to walk out of the meeting. The Plaintiff opted to walk out of the meeting because per the policeman's bill of rights, he was entitled to a union lawyer and did not want to continue the conversation without representation.

21.     In June 2019, the Plaintiff noticed irregularities in the way his supervisors treated his case assignments. The Plaintiff was the only person in the agency assigned to ICAC. The Defendant suddenly began assigning officers to the Plaintiff's unit.  These officers expressed that

they did not want to do this work because of what was involved; it was emotionally taxing given that it deal with the sexual exploitation of children.

22.    The Plaintiff met with Major Stasio and Captain Scott Carris to voice his concerns and they assured him that they were happy with his work product and that his position was safe, despite them effectively having the Plaintiff train his replacements. In turn, the Plaintiff informed both supervisors that the Defendant was violating the ICAC National Standards and the memorandum of understanding by forcing employees to investigate cases wherein they would be required to view countless files depicting children being sexually abused. Furthermore, these investigations require the investigator to have advanced education in various technology platforms (refer to the National ICAC Investigative Standards and Operating Procedures Section #4 'Selection and Retention of ICAC Task-Force Personnel). Major Stasio responded that if the detectives were unwilling or unable to investigate these cases, then they could return to the patrol division.

23.    Sometime in June 2019, Major Stasio expressed concern and embarrassment to the Plaintiff that Plaintiff was the only detective in the agency that was capable of investigating cyber related cases. In response, the Plaintiff offered to create a lesson plan/presentation so that the Plaintiff could teach the investigative division on how to investigate cases relating to telecommunications, social media, IP addresses, and computers. The Plaintiff submitted the finished lesson plan/presentation on July 17, 2019.   The Defendant never asked the Plaintiff to conduct the training.

24.    Since he didn't receive any response, the Plaintiff sent an email to Sergeant Goodwin to follow up on conducting the training. Defendant never requested the Plaintiff provide this training.

25.     In September 2019, the Plaintiff received his yearly evaluation.  The evaluation did not note any performance deficiencies and the Defendant rated Plaintiff very highly.

26.     On October 17, 2019, Sergeant Goodwin addressed members of SVU to inform everyone that the command staff was upset that the Plaintiff was earning more overtime in comparison to the other SVU detectives. The audit revealed that the Plaintiff earned the majority of his overtime by volunteering to assist the on-call detectives who requested additional detectives for a priority case. In order to prevent the Plaintiff from working additional overtime, there would now be two on-call detectives. This was clear and direct retaliation by the Defendant, specifically Sergeant Goodwin, for Plaintiff's May 2019 demand for legal representation from the Union. Defendant's common practice is to allow members with seniority to take overtime assignments to make additional money and build their pensions. Defendant has not taken this kind of action to prevent any other employee from earning overtime.  There are four other investigative units that are not required to operate in this manner and are permitted to earn overtime without administrative interference provided there is not abuse by the employees.

27.     At the end of October 2019, during a Union meeting, the Plaintiff publicly expressed that he was being targeted and discriminated against. Specifically, the Plaintiff said that he was being treated differently than his non-Jewish, heterosexual coworkers and asked Major Stasio and Captain Carris if he was doing something wrong that justified this treatment. The Plaintiff asked that if he were doing something wrong that Major Stasio and Captain Carris tell him because he takes his job very seriously. Major Stasio and Captain Carris responded that they were happy with him and just wanted him to train more people for his unit. The Plaintiff expressed that he was not comfortable with it because the Defendant was requiring that people work in the unit despite not wanting to work these types of matters. Major Stasio said, "it is not your call, if

they are too stupid of unwilling to do it, then they can go back to the road." Major Stasio and Captain Carris were the decisionmakers regarding the Plaintiff's demotion.

28.     Shortly thereafter, on November 21, 2019, Sergeant Goodwin summoned the Plaintiff to Captain Carris's office, where they informed him that he was "no longer a good fit" for SVU and Defendant was "moving in a different direction. They went on to tell the Plaintiff that, effective December 24, 2019, they were transferring him back to the patrol division. They did not offer any further explanation beyond "it is what it is." The Plaintiff was left feeling worthless and expendable by the very employer that he so proudly served. The reassignment affected the Plaintiff's income, detective benefits, and his schedule, and he is no longer part of the ICAC.

29.     On December 1, 2019, the Plaintiff met with Chief Shimpeno to discuss his demotion and informed him that he believed it was retaliatory. When Chief Shimpeno attempted to refute the allegation by alleging the demotion was performance based, the Plaintiff pointed to his previous evaluations and lack of discipline. Chief Shimpeno told the Plaintiff that he would look into the matter, however, the Plaintiff never received any follow-up from this meeting.

30.     On December 4, 2019, Captain Carris sent out a memorandum to all detectives announcing that Detective Samarco would be taking the Plaintiff's position, and that Detective Samarco's position in the General Crimes Unit was available. Captain Carris indicated that any detective wishing to be considered for that position could do so by submitting a memorandum to him before December 9, 2019. The Plaintiff submitted his memorandum of interest the same day, but Captain Carris immediately denied Plaintiff's request without consideration, despite the fact that Plaintiff was qualified and eligible for the position. This was contrary to common past practices of Defendant, which require Defendant to at least consider every eligible employee.  In this instance, the Defendant denied the Plaintiff without any consideration prior to the deadline

date. The Defendant later claimed that since the Plaintiff was being transferred back to the road, the Plaintiff was not eligible to apply for another detective position. Contrary to this explanation, Detective Erwin Lopez (non-Jewish, heterosexual male) was previously a rotation detective within the General Crimes Unit. When Detective Lopez's time in the detective bureau was ending, he applied for a vacant position within the Special Victims Unit and was given that position. As such, Detective Lopez. similarly situated to Plaintiff, clearly received more favorable treatment.

31.     On December 12, 2019, after exhausting all efforts to resolve the above-described issues, the Plaintiff filed his Charge of Discrimination with the EEOC. The charge was later amended on October 26, 2020.

32.     On December 30, 2019, the Plaintiff received an email from Captain Carris requesting to meet with him in regard to an email to a victim's father. This email was in response to an email the victim sent the Plaintiff requesting an update on his investigation. The Plaintiff met with Captain Carris and Sergeant Goodwin, who told him that Plaintiff was to continue to investigate his active SVU investigations despite being reassigned to the patrol division. Captain Carris presented the Plaintiff with the email he sent Mr. Pujols and another email that he sent Sergeant Goodwin on December 19, 2019, titled "Active Cases/SVU departure." Captain Carris stated that the Plaintiff was unprofessional and snarky in those emails and threatened the Plaintiff with future discipline if his behavior failed to change. The Plaintiff remained professional during this meeting and explained that he did not believe he was being unprofessional and was only attempting to communicate with all concerned parties. Prior to his reassignment, the Plaintiff closed out all of his cases that were complete and prepared an update email on his active cases and what needed to be done on them in order to assist anyone who would be assigned to them. The Defendant deviated from common practices by requiring the Plaintiff to work as a patrol officer

on the streets while investigating the cases from a unit from which he was removed. According to Defendant's normal practices, Plaintiff would normally be required to work on his active cases from the date he was notified of his transfer through his transfer date, at which point the active cases would be reassigned to a different detective. Requiring Plaintiff to continue to investigate these open matters instead of reassigning them was contrary to Defendant's normal practices. For example, prior to the Plaintiff's demotion, Detective Robinson Perez (non-Jewish, heterosexual male) was promoted to the rank of Sergeant. Upon leaving SVU, all of Detective Perez's open cases were reassigned to his replacement. As such, Detective Perez. similarly situated to Plaintiff, clearly received more favorable treatment.

33.     On January 10, 2020, the Plaintiff traveled to Port Saint Lucie in a marked police vehicle by himself to interrogate a serial child molester as part of his active cases from his time as a detective. In the past when the Plaintiff left town to investigate a suspect, the Defendant mandated that the Plaintiff travel with another detective for safety reasons. Upon returning to town, the Plaintiff provided the command staff with an investigative summary.

34.     On January 12, 2020, Captain Feiner inquired in an email how the Plaintiff paid for the tolls during the trip. The Plaintiff responded that he did not since he was in a marked unit. Captain Feiner requested that he meet with the logistics unit in order to ascertain what the policy is on the matter and was later advised that marked units were exempt from tolls. On the same day, the Plaintiff contacted EEOC Investigator Wooten to inform her that the Defendant was continuing to retaliate against him. Wooten stated that he should continue to document any incidents since the city was previously charged with retaliation.

35.     On January 31, 2020, Captain Carris warned the Plaintiff's new supervisors that Plaintiff is "problematic" and "needs to be closely monitored."

36.     On February 13, 2020, the Plaintiff learned that the command staff held a secret meeting in order to ask his then-current squad if the Plaintiff did anything that made them feel uncomfortable.

37.     On February 18, 2020, the Plaintiff went to work on his day off in order to arrest a suspect for forcible rape of a child. He notified command of this both before and after the arrest. The Plaintiff worked on this case for approximately six months and was able to develop sufficient probable cause for an arrest. Normally, this type of arrest would be put out on a shift sheet or included in a press release, but Defendant refused to take those steps. It was not until the Plaintiff spoke to the captain and his union representative that the Defendant included the arrest in a press release.

38.     In February 2020, the Plaintiff went to a 7/11 in his patrol area to warm up his food in the microwave. Captain Eric Abrahamson entered the business and yelled at the police officers inside in front of the staff and patrons. Captain Abrahamson requested to speak with the Plaintiff since he was the senior officer. Captain Abrahamson stated that the Plaintiff was in violation of policy with respect to congregating with other officers. Captain Abrahamson stated that he was not going to write the Plaintiff up since he was aware of his "issues" with the command staff, referring to the Plaintiff's EEOC charge. The Plaintiff immediately reported this to Sergeant Jennifer Martin, his supervisor.

39.     On May 7, 2020, the FBI contacted the Plaintiff regarding a case. The FBI requested that the Plaintiff assist in asking the suspect to meet the Plaintiff at the police department to pick up property so that the FBI could safely take the suspect into custody. As instructed, the Plaintiff emailed his command asking for permission to assist with this request. Captain Carris and Sergeant

Goodwin told the Plaintiff not to take any action. This upset the FBI and damaged the Plaintiff's reputation amongst his peers.

40.     On May 14, 2020, Mr. Adam Granit, FBI, contacted the Plaintiff to inform him that Sergeant Goodwin told Mr. Granit to only communicate with her. Mr. Granit said that the FBI would need the Plaintiff to testify and assist in the federal prosecution and Sergeant Goodwin said that they would cross that path at a later date.

41.     On June 15, 2020, the Plaintiff received notice that an arrest warrant had been issued for a sex crimes suspect. In accordance with Defendant's common and past practices, the Plaintiff contacted the suspect's attorney to arrange for the suspect to surrender himself at the Broward Jail. The attorney asked to speak with his client and assured the Plaintiff that he would contact him the following day. The Plaintiff immediately emailed command to provide an update.

42.     On June 16, 2020, the attorney contacted the Plaintiff and stated that he did not want to turn his client in at the jail but requested to meet with the Plaintiff at the station with his client in order to proffer information related to the case. Once that was complete, he would surrender his client to the Plaintiff so he could be transported to the jail. The attorney stated that his next available date to meet would be June 19, 2020, at 10 a.m.  The Plaintiff agreed with this plan. The Plaintiff again emailed command with an update.

43.     On June 17, 2020, Captain Carris sent an email accusing the Plaintiff of not properly updating command on this arrangement, expressing a concern that the Plaintiff would incur overtime, and accusing the Plaintiff of failing to obtain authorization to arrange a surrender. This is despite the fact that arranging a surrender does not require any command authorization. Captain Carris directed the Plaintiff to have no further contact with the attorney and informed the

Plaintiff that a different detective would conduct the interview and arrest the suspect on Friday. The Plaintiff responded in order to obtain clarification on some discrepancies.

44.     On June 18, 2020, the Plaintiff met with Captain Carris, Sergeant Palant, Sergeant Goodwin, and Detective Scott Kushi. During the meeting, Captain Carris accused the Plaintiff of not requesting permission to communicate with the suspect's attorney. The Plaintiff responded that he updated the command staff after every interaction. The Plaintiff advised them that a detective never needed to ask for permission to speak with someone on a case. Captain Carris stated that the Plaintiff organized a "take-down" at the station without receiving permission. The Plaintiff responded that it was not a "take-down" but a self-surrender in compliance with a warrant. Captain Carris accused the Plaintiff of purposely scheduling the surrender in a way that would result in Plaintiff receiving overtime. The Plaintiff responded that he initially requested that the suspect self-surrender at the jail, which would not have required Plaintiff's presence, and thus would not have resulted in overtime pay to Plaintiff. The Plaintiff reiterated that the suspect's attorney as the one who requested to meet with the Plaintiff and who chose the date and time. The Plaintiff asked if he violated a policy and was told that he did not.  Captain Carris stated that the Plaintiff used bad judgment and was unmanageable. The Plaintiff responded that he took great offense to that and considered himself to be an asset to the Defendant and a great employee. Captain Carris stated again that the Plaintiff utilized poor judgment. The Plaintiff informed everyone in the room that he believed that the meeting was another way to retaliate against him. The Plaintiff informed them that he had done everything that was asked of him and was still being bullied. The Plaintiff told them that he was being treated differently from all other employee by being required to investigate these cases only after being notified of the EEOC complaint. The Plaintiff questioned, if his judgment was so poor, then how was he a detective in the highest

liability unit in the agency for almost ten years. He also asked if his judgment was so poor, why did the Defendant assign him to work on high profile case, lead raids on houses with a SWAT team, and train new officers and supervisors. The Defendant then ordered him not to discuss his demotion in a negative manner moving forward. Sergeant Palant and Detective Kushi later told the Plaintiff that they were in shock upon witnessing his treatment by Defendant.

45.     On August 6, 2020, the Defendant began to target Detective Renee Wilks non-Jewish, heterosexual female), who was the Plaintiff's work partner while in SVU. Since the Defendant demoted Plaintiff, Sergeant Goodwin targeted Detective Wilks since she remained loyal to the Plaintiff and was vocal in objecting to the way Defendant treated him. On multiple occasions, Sergeant Goodwin targeted Detective Wilks by accusing her of not being a good fit for the unit, particularly because she was a single mother. This was despite the fact that Detective Wilks never missed a "call out" and had perfect attendance. To avoid the mistreatment and associated stress, Detective Wilks requested a transfer to leave SVU and be assigned to a school as a school resource officer ("SRO").

46.     On August 6, 2020, it was Detective Wilks' last day in SVU. All of her cases were reassigned to the new detective, and she was not required to continue her investigations, maintain any SVU obligations, and was not required to complete weekly update reports – all unlike the work still required of the Plaintiff.

47.     On August 7, 2020, Detective Wayne Katz, homicide unit, told the Plaintiff that he had been very vocal in objecting to the way command staff treated both Detective Wilks and the Plaintiff. Detective Katz informed the Plaintiff that a ranking official that he was told him he was not permitted to continue to express his opinion on the topic.

14

48.     On September 24, 2020, Sergeant Palant met with the Plaintiff to inform him that he submitted Plaintiff's annual evaluation. Sergeant Palant stated that command staff responded to the submission and appeared upset because the evaluation made it look like the Plaintiff deserved to be awarded "officer of the year.". Sergeant Palant told the command staff that the Plaintiff deserved the high rating and that he did not feel comfortable changing the evaluation. In response, the command staff told Sergeant Palant to work with Sergeant Goodwin so that she could provide her own input. Sergeant Goodwin added her comments to the evaluation and requested that the Plaintiff be rated "area for growth" in lieu of "exceeds expectations." Sergeant Goodwin tried to entice Sergeant Palant by telling him that she had great respect for him and that she would like to mold him as her replacement to take over SVU once she retires.

49.     On October 5, 2020, the Plaintiff spoke with Sergeant Chris Chacon-Chang and Detective Scott Kushi, Union Representatives, regarding never receiving his completed annual evaluation. The Plaintiff should have received it on or about August 26, 2020. They responded that they would look into it.

50.     On October 12, 2020, the Plaintiff received his 2019-2020 evaluation. All supervisors wrote positive feedback and described the Plaintiff as an asset to the Defendant. Sergeant Goodwin added all negative and false comments in this evaluation.

51.     On November 12, 2020, the Plaintiff received a unit and individual commendation at the award ceremony for the 2019 year. Both awards were authored by Sergeant Goodwin for cases that the Plaintiff worked just prior to his demotion.

52.     On November 16, 2020, the Plaintiff was contacted by a source within the ICAC taskforce who informed him that Sergeant Goodwin had been requesting assistance from them on multiple occasions to assist in investigating ICAC related cases within Pembroke Pines. It is clear

that the Defendant's decision to demote the Plaintiff was not in the best interest of the agency and the community.

53.     On March 31, 2020, the Plaintiff had intestinal surgery and his doctor placed him on light duty for work. There are currently multiple officers on light duty assignments most of whom are junior to the Plaintiff. Those officers are permitted to work from home taking telephone reports. However, the Defendant ordered the Plaintiff to remain outside of the police station in the heat for 10 hours a day checking people's temperatures as they entered the building or reported for duty.

54.     On April 9, 2021, the Plaintiff learned that Officer Velez-Ortega, who is junior to the Plaintiff, was placed on light duty and was permitted to work at the Emergency Operations Center.

55.     As of May 2021, Plaintiff went back to work on full duty and is currently still working for the Defendant as a police officer.

56.     Plaintiff has engaged the undersigned attorney to prosecute his claims and is entitled to recover his attorney's fees from Defendant pursuant to statute.

## COUNT I: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### (Discrimination on the Basis of Gender)

57.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 56, inclusive, as though same were fully re-written here.

58.     Plaintiff brings this action under Title VII for damages caused by Defendant's unlawful employment practices committed against Plaintiff because Plaintiff was discriminated on the basis of his gender, homosexual male.

59.     At all times relevant, superiors of the new command staff were acting within the course and scope of their employment for Defendant.

16

60.     Because Plaintiff is a homosexual man, he was discriminated against by the new command staff and the Defendant refused to take any action to prevent the discrimination.

61.     Upon information and belief, similarly situated heterosexual male employees are not treated in the same manner as Defendant treated Plaintiff.

62.     Upon information and belief, the Defendant takes seriously the complaints of similarly situated heterosexual male employees.

63.     Defendant engaged in unlawful employment practices in violation of Section 703(a)(1) of Title VII, 42 USC §2000e2(a)(1) which resulted in Plaintiff, MICHAEL SILVER, being discriminated against.

64.     Plaintiff is entitled to such affirmative relief as may be appropriate, including but not limited to, lost wages, benefits, and compensation for emotional distress pursuant to the provisions of Title VII of the Civil Rights Act of 1964, §706(g).

WHEREFORE, Plaintiff hereby requests that this Court grant Plaintiff judgment against Defendant to compensate him for past and future pecuniary losses, including back pay, front pay, injury to his professional reputation, and emotional pain and suffering caused by Defendant's discriminatory treatment in an amount to be determined at trial and in accordance with Title VII of the Civil Rights Act of 1964, §706(g); attorney's fees, costs, together with interest thereon, and such other relief as the Court deems just and appropriate.

### COUNT II: VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992
### (Discrimination on the Basis of Gender)

65.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 56, inclusive, as though same were fully re-written here.

66.     The FCRA forbids discrimination on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in

personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

67.    The Florida Civil Rights Act of 1992 shall be construed according to the fair import of its terms and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved.

68.    Plaintiff is a homosexual male, and therefore a member of a protected class.

69.    At all times relevant, superiors of the new command staff were acting within the course and scope of their employment for Defendant.

70.    Because Plaintiff is a homosexual man, he was discriminated against by the new command staff and the Defendant refused to take any action to prevent the discrimination.

71.    Upon information and belief, similarly situated heterosexual male employees are not treated in the same manner as Defendant treated Plaintiff.

72.    Upon information and belief, the Defendant takes seriously the complaints of similarly situated heterosexual male employees.

73.    At all relevant and material times, Defendant failed to comply with the FCRA.

74.    At all times relevant, including at the time of the unlawful and discriminatory treatment, Defendant was aware that Plaintiff was a homosexual man.

75.    At the time of the unlawful discrimination, Plaintiff did perform and excel at the performance of the essential functions assigned to him by the Defendant.

76.    The failure of Defendant to adhere to the mandates of the FCRA was willful and its violations of the provisions of the FCRA were willful.

77.     Defendant, through its practices and policies as an employer, willfully, and with malicious or reckless disregard of Plaintiff's protected rights, discriminated against Plaintiff on account of him being a homosexual male in violation of the FCRA with respect to its decision to treat Plaintiff differently from other employees.

78.     Defendant's treatment of Plaintiff was directly and proximately caused by Defendant's unjustified discrimination against Plaintiff because he is a homosexual male, in violation of the FCRA.

79.     Any allegedly nondiscriminatory reason for the treatment of Plaintiff asserted by Defendant is a mere pretext for the actual reasons for the treatment; namely, Plaintiff being a homosexual man. Defendant's actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination due to his sex. The discrimination on the basis of sex constitutes unlawful discrimination.

80.     As a direct and proximate result of Defendant's intentional conduct, Plaintiff has suffered economic losses, as well as mental pain and suffering.

WHEREFORE, Plaintiff hereby requests this Court enter judgment against the Defendant for all wages and benefits the Plaintiff would have received but for the discrimination, including actual damages suffered, compensatory damages under the FCRA for embarrassment, anxiety, humiliation, and emotional distress, prejudgment and post-judgment interest, attorney's fees, costs, and such other and further relief as this Court deems just and appropriate.

### COUNT III: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
**(Discrimination on the Basis of Religion)**

81.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 56, inclusive, as though same were fully re-written here.

82. Plaintiff brings this action under Title VII of the Civil Rights Act of 1964, §§703(a), 706(a), and 706(g) for damages caused by Defendant's unlawful employment practices committed against Plaintiff because Plaintiff was discriminated against on the basis of his religion, Jewish.

83. At all times relevant, superiors of the new command staff were acting within the course and scope of their employment for Defendant.

84. Because Plaintiff is Jewish, he was discriminated against by the new command staff and the Defendant refused to take any action to prevent the discrimination.

85. Upon information and belief, similarly situated non-Jewish employees are not treated in the same manner as Defendant treated Plaintiff.

86. Upon information and belief, the Defendant takes seriously the complaints of similarly situated non-Jewish employees.

87. Defendant engaged in unlawful employment practices in violation of Section 703(a)(1) of Title VII, 42 USC §2000e2(a)(1) which resulted in Plaintiff, MICHAEL SILVER, being discriminated against.

88. Plaintiff is entitled to such affirmative relief as may be appropriate, including but not limited to, lost wages, benefits, and compensation for emotional distress pursuant to the provisions of Title VII of the Civil Rights Act of 1964, §706(g).

WHEREFORE, Plaintiff hereby requests that this Court grant Plaintiff judgment against Defendant to compensate him for past and future pecuniary losses, including back pay, front pay, injury to his professional reputation, and emotional pain and suffering caused by Defendant's discriminatory treatment in an amount to be determined at trial and in accordance with Title VII of the Civil Rights Act of 1964, §706(g); attorney's fees, costs, together with interest thereon, and such other relief as the Court deems just and appropriate.

## COUNT IV: VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992
### (Discrimination on the Basis of Religion)

89.     Plaintiff incorporates herein the allegations contained in paragraphs 1 through 56, inclusive, as though same were fully re-written here.

90.     The FCRA forbids discrimination on the basis of race, color, religion, sex, pregnancy, national origin, age, handicap, or marital status and thereby to protect their interest in personal dignity, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest, to preserve the public safety, health, and general welfare, and to promote the interests, rights, and privileges of individuals within the state.

91.     The Florida Civil Rights Act of 1992 shall be construed according to the fair import of its terms and shall be liberally construed to further the general purposes stated in this section and the special purposes of the particular provision involved.

92.     Plaintiff is Jewish, and therefore a member of a protected class.

93.     Because Plaintiff is Jewish, he was discriminated against by the new command staff and the Defendant refused to take any action to prevent the discrimination.

94.     Upon information and belief, similarly situated non-Jewish employees are not treated in the same manner as Defendant treated Plaintiff.

95.     Upon information and belief, the Defendant takes seriously the complaints of similarly situated non-Jewish employees.

96.     At all relevant and material times, Defendant failed to comply with the FCRA.

97.     The discrimination of Plaintiff by Defendant was caused by Defendant being aware of Plaintiff's religion.

98.     At all times relevant, including the time of the unlawful and discriminatory treatment, Defendant was aware that Plaintiff was Jewish.

21

99.     At the time of the unlawful discrimination, Plaintiff did perform and excel at the performance of the essential functions assigned to him by Defendant.

100.     The failure of Defendant to adhere to the mandates of the FCRA was willful and its violations of the provisions of the FCRA were willful.

101.     Defendant, through its practices and policies as an employer, willfully, and with malicious or reckless disregard of Plaintiff's protected rights, discriminated against Plaintiff on account of his religion in violation of the FCRA with respect to its decision to treat Plaintiff differently from other employees.

102.     Defendant's treatment of Plaintiff was directly and proximately caused by Defendant's unjustified discrimination against Plaintiff because he was Jewish, in violation of the FCRA.

103.     Any allegedly nondiscriminatory reason for the treatment of Plaintiff asserted by Defendant is a mere pretext for the actual reasons for the treatment; namely, Plaintiff's religion.

104.     Defendant's actions were malicious and were recklessly indifferent to Plaintiff's rights protecting persons from discrimination due to his religion. The discrimination on the basis of religion constitutes unlawful discrimination.

105.     As a direct and proximate result of Defendant's intentional conduct, Plaintiff has suffered economic losses, as well as mental pain and suffering.

WHEREFORE, Plaintiff hereby requests this Court enter judgment against the Defendant for all wages and benefits the Plaintiff would have received but for the discrimination, including actual damages suffered, compensatory damages under the FCRA for embarrassment, anxiety, humiliation, and emotional distress, prejudgment and post-judgment interest, attorney's fees, costs, and such other and further relief as this Court deems just and appropriate.

## <u>COUNT V: VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964</u>
### (Retaliation)

106.    Plaintiff incorporates herein the allegations contained in paragraphs 1 through 56, inclusive, as though same were fully re-written here.

107.    Plaintiff had the right to voice his grievances that he was being discriminated against.

108.    When the Plaintiff engaged in the protected activity of reporting the discrimination, the Defendant retaliated against him by continuing and intensifying the discrimination and ultimately demoting the Plaintiff.

109.    In addition, Plaintiff suffered harm by not being offered a transfer to a detective position (or even the opportunity to interview for such a position) after his demotion.

110.    As a result of Defendant's action, Plaintiff has suffered damages.

111.    Plaintiff is entitled to such affirmative relief as may be appropriate, including, but not limited to, lost wages, benefits, and compensation for emotional distress, pursuant to the provisions of Title VII of the Civil Rights Act of 1964.

WHEREFORE, Plaintiff hereby requests that this Court: (a) declare that Defendant's demotion of the Plaintiff was in violation of Title VII of the Civil Rights Act of 1964; (b) grant Plaintiff judgment against Defendant to compensate him for past and future pecuniary losses, including injury to his professional reputation, and emotional pain and suffering caused by Defendant's demotion of Plaintiff in an amount to be determined at trial and in accordance with Title VII of the Civil Rights Act of 1964; (c) award Plaintiff prejudgment and post-judgment interest; (d) award Plaintiff compensatory damages as permitted by law; (e) award Plaintiff the costs of this action, together with his reasonable attorneys' fees incurred herein; and (f) grant Plaintiff such other and further relief as the Court deems appropriate.

## COUNT VI: VIOLATION OF THE FLORIDA CIVIL RIGHTS ACT OF 1992
**(Retaliation)**

112.    Plaintiff incorporates herein the allegations contained in paragraphs 1 through 56 inclusive, as though same were fully re-written here.

113.    Plaintiff had the right to voice his grievances that he was being discriminated against.

114.    When the Plaintiff engaged in the protected activity of reporting the discrimination, the Defendant retaliated against him by continuing and intensifying the discrimination and ultimately demoting the Plaintiff.

115.    In addition, Plaintiff suffered harm by not being offered a transfer to a detective position (or even the opportunity to interview for such a position) after his demotion.

116.    As a result of Defendant's actions, Plaintiff has suffered damages

117.    Plaintiff is entitled to such affirmative relief as may be appropriate, including, but not limited to, lost wages, benefits, and compensation for emotional distress, pursuant to the provisions of the FCRA, Chapter 760.

WHEREFORE, Plaintiff hereby requests that this Court: (a) declare that Defendant's demotion of the Plaintiff was in violation of the FCRA; (b) grant Plaintiff judgment against Defendant to compensate him for past and future pecuniary losses, including injury to him professional reputation, and emotional pain and suffering caused by Defendant's demotion of Plaintiff in an amount to be determined at trial and in accordance with the FCRA; (c) award Plaintiff prejudgment and post-judgment interest; (d) award Plaintiff compensatory damages as permitted by law; (e) award Plaintiff the costs of this action, together with his reasonable attorneys' fees incurred herein; and (f) grant Plaintiff such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted August 24, 2021,

*/s Allison B. Duffie*
Allison B. Duffie, Esq.
Fla. Bar No. 649902
allison@duffie.law
DUFFIE LAW, PLLC
2234 North Federal Highway
Suite 1196
Boca Raton, Florida 33431
Tel: 561.440.1196
***Attorney for Plaintiff***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 24, 2021 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/Allison B. Duffie, Esquire*

## <u>SERVICE LIST</u>

***Silver v. City of Pembroke Pines***
**Case No. 21-61148-CRAR**

Michelle C. Levy, Esquire
The Law Office of Michelle Cohen Levy
633 SE 3rd Avenue
Suite 4F
Fort Lauderdale, Florida 33301
Tel: 954-651-9196
E-mail: michelle@cohenlevylegal.com
***Counsel for Plaintiff***
*Via CM/ECF Notice of Electronic Filing*

James A. Cherof, Esquire
Gal Betesh, Esquire
Goren, Cherof, Doody & Ezrol P.A.
3099 East Commercial Blvd., Suite 200
Fort Lauderdale, Florida 33308
Tel: 954-771-4500
E-mail: jcherof@gorencherof.com
E-mail: gbetesh@gorencherof.com
***Counsel for Defendant***
*Via CM/ECF Notice of Electronic Filing*