UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 21-CV-61148-RAR

MICHAEL SILVER,

      Plaintiff,

v.

CITY OF PEMBROKE PINES,

      Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** comes before the Court upon Defendant's Motion for Summary Judgment [ECF No. 40] ("Motion"). Having reviewed the Motion, Plaintiff's Response in Opposition [ECF No. 52] ("Response"), Defendant's Reply to Plaintiff's Opposition [ECF No. 58] ("Reply"), the record, applicable law, and being otherwise fully advised, it is hereby

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment is **GRANTED**.

**BACKGROUND**

Although lengthy, the Court finds it necessary to recount all facts alleged in the Amended Complaint in order to properly detail the complex record which takes place over the course of approximately two years. The facts which are not in dispute have been taken from Defendant's Statement of Material Facts, [ECF No. 39] ("DSOMF"). Facts in dispute are noted as such or have been taken from Plaintiff's Statement of Material Facts, [ECF No. 51] ("PSOMF").[1]

---

[1]  In their Reply, Defendant correctly points out that Plaintiff's Response violates Southern District of Florida Local Rules 7.1(c)(2) & 56.1(d) as Plaintiff's Statement of Material Facts and Opposition Memorandum of Law exceed five and twenty pages respectively. While Defendant is also correct that failure to follow these rules can result in the striking of pleadings or the imposition of sanctions, the Court finds it unnecessary to grant such relief. Given that the purpose of 7.1(c)(2) & Local Rule 56.1 is to

### a. Plaintiff's Employment History

Plaintiff is a Jewish male who identifies as homosexual.  DSOMF ¶ 1.  Plaintiff was hired by the City's Police Department ("PPPD") on June 24, 2003 as a road patrol officer and served in that role for approximately eleven years until 2014 when he was transferred to the detective bureau, specifically the Special Victims Crime Unit ("SVU").  *Id*. at ¶¶ 1, 2, 4, 5.  Plaintiff came out as gay to his co-workers in the PPPD around 2007.  *Id*. at ¶ 3.  Throughout his career, Plaintiff received numerous awards and commendations for his work.  *Id*. at ¶ 8.

### b. Shomrim Society "Man of the Year" Award

Plaintiff testified he began feeling discriminated against in October of 2018 when he was notified that the Shomrim Society, a Jewish foundation, intended to give him the "Man of the Year" award.  PSOMF ¶ 9.  Pursuant to PPPD policy, Plaintiff needed approval from the City's Chief of Police to receive an award from an outside agency.  DSOMF ¶ 10.  Plaintiff asked his immediate supervisor, Sergeant Angela Goodwin ("Sergeant Goodwin"), if he could accept the award from the Shomrim Society, and Sergeant Goodwin went up her chain of command to obtain approval.  *Id*. at ¶ 11.  After Sergeant Goodwin conveyed the request to the chain of command, she asked Plaintiff who nominated him for the award and questioned Plaintiff on why he was receiving the award in a manner Plaintiff claims made him uncomfortable.  PSOMF ¶ 12.  Plaintiff was granted permission to accept the award from the Shomrim Society and attended the banquet along with the City's Vice Mayor, Sergeant Goodwin, Major Chris Stasio ("Major Stasio"), and Chief Kipp Shimpeno.  DSOMF ¶ 13.

---

conserve judicial resources by "mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge," *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008), the Court finds that requiring the parties to re-brief these issues would unnecessarily delay the adjudication of this case. Accordingly, Plaintiff's Response will be deemed constructively amended insofar as necessary to comply with Local Rules 7.1(c)(2) & 56.1(b)(1).

### c. Plaintiff's Performance Issues

Sergeant Goodwin was Plaintiff's immediate supervisor while Plaintiff was an SVU detective with the PPPD. *Id.* at ¶ 14. During her deposition, Sergeant Goodwin testified she has "notes to file" that date back to 2014 and continue through 2019, regarding conversations she had with Plaintiff about his failure to fully investigate cases, his failure to follow the chain of command, and his failure to respect Sergeant Goodwin as his supervisor.[2] *Id.* at ¶ 15. Sergeant Goodwin testified that in late 2018, she began having issues with the Plaintiff on a more regular basis. *Id.* at ¶ 17. Sergeant Goodwin also testified that starting in late 2018, and continuing through 2019, Plaintiff's attitude towards her significantly deteriorated and Plaintiff became argumentative. *Id.* at ¶ 18.

In May of 2019, Sergeant Goodwin approached Captain Scott Carris ("Captain Carris"), her commanding officer, and told him she was not happy with Plaintiff's performance and wanted Plaintiff out of the unit. PSOMF ¶ 19. During this meeting, Sergeant Goodwin showed Captain Carris some of her notes to file which detailed the issues she had been having with Plaintiff. *Id.* at ¶ 20. Captain Carris told Sergeant Goodwin to have a meeting with Plaintiff to set expectations and give Plaintiff a chance to correct his behavior. DSOMF ¶ 20. Defendant claims Plaintiff was not responsive to Sergeant Goodwin's comments at this meeting. *Id.* at ¶ 21. Captain Carris testified Plaintiff became very defensive, stormed out of the meeting, slammed a door, and

---

[2] Plaintiff maintains all "notes to file" regarding his performance issues constitute inadmissible hearsay that cannot be considered at summary judgment. While "inadmissible hearsay cannot be considered on a motion for summary judgment[,]" the Court is free to consider the statements if they "could be reduced to admissible evidence at trial or reduced to admissible form." *Macuba v. Deboer*, 193 F.3d 1316, 1322-23 (11th Cir. 1999). As "the most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial[,]" the writers of these "notes to file", all of whom are available and were deposed in this case, would be able to testify to Plaintiff's performance issues. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012). Thus, the undisputed testimony related to Plaintiff's performance issues may be considered.

proceeded to kick another door open. *Id*. Plaintiff counters he only verbally disagreed with Sergeant Goodwin's accusations and indicated he wanted a commanding officer and union representative present as he felt he was being improperly disciplined. PSOMF ¶ 21. Plaintiff admits to walking out of the meeting but denies slamming or kicking any door. *Id*.

At subsequent meetings, Sergeant Goodwin and Captain Carris raised performance issues including, but not limited to: (1) if Plaintiff felt a case did not require his time then he would come to conclusions without conducting a thorough investigation; (2) issues with Plaintiff skipping the chain of command; and (3) Plaintiff failing to keep Sergeant Goodwin informed of ongoing investigations. DSOMF ¶ 23. Plaintiff admits these conversations took place but denies these performance issues existed. PSOMF ¶ 23. Some of these performance issues were reflected in Plaintiff's 2019 Performance Evaluation which states, for example, "[t]here have been a few investigations this year where Detective Silver has failed to communicate necessary case information to his sergeant in a timely manner. Detective Silver was talked to about keeping his sergeant updated and not skipping the chain of command and has been doing much better in the last couple of months." *Id*. at ¶ 25. Further, Captain Carris explained during his deposition that while Plaintiff could be a good detective, his failure to follow the chain of command and his failure to be a team player was a serious problem, especially given the type of cases Plaintiff was tasked with investigating. DSOMF ¶ 26. This was despite the fact that, as Plaintiff notes, he was ranked as "Exceeds Expectations" in the category of teamwork in his 2015, 2016, 2017, and 2018 performance evaluations. PSOMF ¶ 26.

### d.  *Plaintiff's Raising of Issues*

On June 13, 2019, Plaintiff met with his union representative, Scott Kushi, and told him he was feeling discriminated against because of his sexuality and religion. DSOMF ¶ 27. Plaintiff does not know, and there is no evidence to indicate, whether his union representative

communicated that information to anyone in the PPPD. *Id*. at ¶ 28. Further, during his deposition, Plaintiff admitted the union is a completely separate entity from the PPPD. *Id*. at ¶ 29. On June 17, 2019, Plaintiff met with Captain Carris and Major Stasio, and during this meeting Plaintiff told them he was being singled out and felt he had a target on his back. *Id*. at ¶ 30. During this June 17, 2019 meeting, Plaintiff did not say he felt he was being targeted or treated differently because of his religion or sexuality. *Id*. at ¶ 31. On November 7, 2019, Plaintiff told Sergeant Goodwin he felt targeted and he was being treated unfairly. *Id*. at ¶ 32. During this November 7, 2019 meeting, Plaintiff, once again, did not say he was feeling singled out because of his protected classes or mention his protected classes at all. *Id*. at ¶ 33.

On December 12, 2019, after Plaintiff's transfer to road patrol discussed *infra*, Plaintiff filed a Charge of Discrimination with the EEOC which was later amended on October 26, 2020. DSOMF ¶ 46.

### e. *Plaintiff's Transfer to Road Patrol*

Captain Carris testified that by November of 2019, a point was reached where the PPPD had to decide between taking formal disciplinary actions against Plaintiff because of his behavior, which would remain on Plaintiff's permanent file, or transfer Plaintiff to road patrol. DSOMF ¶ 34. On November 21, 2019, Sergeant Goodwin and Captain Carris met with Plaintiff and advised him he was being transferred to road patrol. *Id*. at ¶ 38. Plaintiff was told he would begin working as a road patrol officer on December 24, 2019 and he had until then to close out his cases. PSOMF ¶ 39. Moreover, during this November 21, 2019 meeting, Plaintiff asked Captain Carris if he could transfer to another unit within the detective bureau, to which Captain Carris replied he could not. DSOMF ¶ 40. Captain Carris testified that, based on Plaintiff's attitude at that time, he felt keeping Plaintiff involved with investigations would be disruptive to the bureau. *Id*. While Plaintiff admitted his rank did not change when he was transferred to road patrol, *id*. at ¶ 44, the transfer to

patrol eliminated his cell phone allowance, uniform allowance, unmarked take home vehicle, and a 3% pay increase for working as a detective and provided less opportunities to pick up overtime. PSOMF ¶ 45.

On December 4, 2019, Plaintiff received an email from Captain Carris to all PPPD detectives stating there was a position available in General Crimes and any detectives interested in the position should submit a memorandum to him by December 9, 2019. PSOMF ¶ 94. Plaintiff submitted his application and Defendant denied his application within hours of its submission. *Id*.

On December 24, 2019, when Plaintiff returned to the road, he took with him two open cases from SVU. DSOMF ¶ 41. Plaintiff testified he was not told he needed to continue to work cases after his transfer until a meeting on December 30, 2019. PSOMF ¶ 39. When Plaintiff was transferred to patrol, Plaintiff advised Sergeant Goodwin and Captain Carris as to the status of his cases that could not be closed prior to his transfer. *Id*. at ¶ 42. Plaintiff advised, for Case 1, that all investigative work was completed, and they were only awaiting lab results and the subsequent arrest of the subject. *Id*. Six months later, Case 2 was transferred to other detectives to accept the surrender of a subject and take a factual proffer on the day of surrender. *Id*.

### f. Allegedly Similarly Situated Individuals

Plaintiff alleges he was not treated similarly to Detective Erwin Lopez ("Detective Lopez"), a heterosexual non-Jewish male who was a rotation detective with the General Crimes Unit, because when Detective Lopez's time in the detective bureau was ending, he applied and was given a vacant position within SVU. DSOMF ¶ 48. Plaintiff's position with SVU was permanent, while Detective Lopez was a rotational detective, meaning he had a two-year commitment. *Id*. at ¶ 49. Plaintiff admitted the circumstances surrounding his return to the road and those of Detective Lopez going back to the road were different. *Id*. at ¶ 50.

Plaintiff alleges he was also treated differently than Detective Robinson Perez ("Detective Perez"), a non-Jewish heterosexual male who was promoted to the rank of Sergeant, and who was not required to take open cases with him.  *Id*. at ¶ 51.  Sergeant Goodwin was Detective Perez's supervisor at the time he was promoted to Sergeant, and she testified Detective Perez took several open cases with him upon being promoted.  *Id*. at ¶ 52.  However, Plaintiff testified Detective Perez told Plaintiff he was not required to take open cases with him when he transferred out of SVU.  PSOMF ¶ 52.

Plaintiff also alleges he was treated differently than former SVU detective Yalile Nader ("Officer Nader").  DSOMF ¶ 53.  Plaintiff testified Officer Nader was having performance issues which led her to request that she be transferred to a different unit, and the request was ultimately granted.  *Id*.  Sergeant Goodwin testified that Officer Nader is still working on three open SVU cases, although she is no longer in SVU.  *Id*. at ¶ 54.  Sergeant Goodwin also testified that the difference between Officer Nader and Plaintiff is that Sergeant Goodwin experienced issues with Officer Nader for a shorter period of time and the issues were less egregious than the issues experienced with Plaintiff.  Plaintiff disputes this characterization, stating "Det[ective] Nader was placed on a formal performance improvement plan . . . , which she remained on following her transfer to general crimes."  PSOMF ¶ 55.

Additionally, Plaintiff alleges Nelson Martinez and Kelly Bryant ("Officer Martinez" and "Officer Bryant") were removed from SVU, went back to road patrol, and had their cases reassigned, although Plaintiff admits Sergeant Goodwin never supervised Officers Martinez or Bryant.  DSOMF ¶¶ 57–59.  Finally, Plaintiff alleges Renee Wilks ("Officer Wilks"), a former SVU detective, left SVU willingly and had her cases reassigned.  *Id*. at ¶ 60.

### g. *Plaintiff's Amended Complaint*

On June 1, 2021, Plaintiff filed a Complaint against the City of Pembroke Pines ("City" or "Defendant"), later amended on October 4, 2021, alleging (I) Violation of Title VII of the Civil Rights Act of 1964 ("Title VII") for discrimination on the basis of gender/sexual orientation; (II) Violation of the Florida Civil Rights Act of 1992 ("FCRA") for discrimination on the basis of gender/sexual orientation; (III) Violation of Title VII for discrimination on the basis of religion; (IV) Violation of the FCRA for discrimination on the basis of religion; (V) Violation of Title VII for retaliation; and (VI) Violation of FCRA for retaliation.[3]

## LEGAL STANDARD

Summary judgment is rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a), (c). An issue of fact is "material" if it might affect the outcome of the case under governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). It is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party. *See id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). The non-moving party's presentation of a "mere existence of a scintilla of evidence" in support of its position is insufficient to overcome summary judgment. *Anderson*, 477 U.S. at 252.

---

[3] The parties do not dispute that the FCRA is construed in conformity with Title VII. *See Matias v. Sears Home Improvement Prod.*, 391 F. App'x 782, 785 (11th Cir. 2010); *Harper v. Blockbuster Ent. Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998); *Byrd v. BT Foods, Inc.*, 948 So. 2d 921, 925 (Fla. 4th DCA 2007); *McCaw Cellular Commc'n of Florida, Inc. v. Kwiatek*, 763 So. 2d 1063, 1065 (Fla. 4th DCA 1999). Accordingly, the Court will address Plaintiff's Title VII claims in conjunction with his FCRA claims.

If there are factual issues, summary judgment must be denied, and the case proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). Further, when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Id.* (alteration added and citation omitted).

## <u>ANALYSIS</u>

As a threshold matter, the parties dispute whether *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ("*McDonnel Douglas*") controls this analysis. Resp. at 6. Plaintiff claims he brings a mixed-motive case and therefore, the applicable standard is the mixed-motive framework adopted in *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227 (11th Cir. 2016).[4] *Id.* But, as correctly noted by the City, "[a] mixed motive case is one where *both legitimate and illegitimate reasons* motivated the employer's adverse employment decision." *Williams v. Fla. Atl. Univ.*, No. 15-60621, 2017 WL 1881676, at *4 (S.D. Fla. May 9, 2017), *aff'd*, 728 F. App'x 996 (11th Cir. 2018).

In his Amended Complaint, Plaintiff identifies only *illegitimate* reasons for the City's decision—his religion and sexual orientation. *See, e.g.*, Am. Compl. ¶¶ 97, 103 ("*Any allegedly nondiscriminatory reason* for the treatment of Plaintiff asserted by Defendant is a mere pretext for the actual reasons for the treatment.") (emphasis added). While a plaintiff is not required to "label[] [his case] as either a 'pretext' case or a 'mixed-motives' case from the beginning in the

---

[4] Plaintiff conflates the standard in *Quigg* and *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Specifically, Plaintiff fails to point out the former is reserved for a mixed-motive discrimination case while the latter is a path through which a plaintiff in a single motive case can survive summary judgment provided they "present[] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Johnson*, 858 F. App'x at 310. Accordingly, the Court will address Plaintiff's argument under *Smith* since, as explained *infra*, *Quigg* is inapplicable in this case.

District Court," here Plaintiff wholly fails to allege that "both legitimate and illegitimate considerations played a part in the decision against [him]." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 247 n.12 (1989). Indeed, Plaintiff argues the mixed-motive standard should apply even though Defendant's criticisms of Plaintiff's "performance [are] pretext for Defendant's actual motivations in demoting [him]." Resp. 18. Accordingly, the Court finds that Plaintiff's case is not mixed-motive in nature and the *McDonnell Douglas* framework applies. *See Smith v. Vestavia Hills Bd. of Educ.*, 791 F. App'x 127, 131 (11th Cir. 2019) (holding *McDonnell Douglas* to be the appropriate standard where plaintiff "did not plead or prove a mixed-motive case" and did "not suggest that unlawful bias, in addition to other factors, motivated the adverse actions").

## I.   Title VII & FCRA Discrimination

Under Title VII, "it is unlawful for an employer 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1304 (11th Cir. 2016) (quoting 42 U.S.C. § 2000e-2(a)(1)). Further, the Supreme Court in *Bostock v. Clayton Cnty., Georgia* held that "sex" includes sexual orientation. 140 S. Ct. 1731, 1754 (2020) ("[a]n employer who fires an individual merely for being gay or transgender defies the law"). The FCRA similarly prohibits such discrimination. *See* Fla. Stat. § 760.10(1)(a).

The Eleventh Circuit has developed a framework for adjudicating motions for summary judgment in cases involving Title VII discrimination. Discrimination can be proven through direct or circumstantial evidence. *Hinson v. Clinch Cnty., Ga. Bd. Of Educ.*, 231 F.3d 821, 827 (11th Cir. 2000). Direct evidence is evidence that, "if believed, proves the existence of a fact without inference or presumption. Only the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of

discrimination." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1156 (11th Cir. 2020) (internal citations and quotations omitted).

In single motive cases where there is no direct evidence of discrimination, there are two principal ways in which a plaintiff may establish such intent through circumstantial evidence. The first, and most common, is by using the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). As explained by the Eleventh Circuit:

> When proceeding under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated "similarly situated" employees outside her class more favorably. If the plaintiff succeeds in making out a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that merges with the plaintiff's ultimate burden of persuading the factfinder that she has been the victim of intentional discrimination.

*Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (*en banc*) (internal citations and quotations omitted).

However, the *McDonnell Douglas* framework "is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." *Smith*, 644 F.3d at 1328. Therefore, if the *McDonnell Douglas* path is foreclosed, a plaintiff may nevertheless survive summary judgment if he can "present[] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Johnson v. Airbus Def. & Space Inc*, 858 F. App'x 304, 310 (11th Cir. 2021) (citing *id.*) (internal quotations omitted). Under the *Smith* framework, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a *convincing mosaic* of circumstantial evidence that would allow a jury to infer

intentional discrimination by the decisionmaker." *Id*. (alterations omitted) (emphasis added). A "convincing mosaic" is established by "pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly-situated employees, and (3) pretext." *Johnson*, 858 F. App'x at 310 (internal citations omitted).

### a. *Direct Evidence of Discrimination*

The case at bar is completely devoid of any evidence of direct discrimination.  Under Eleventh Circuit precedent, only "blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Fernandez*, 961 F.3d at 1156 (internal quotations omitted).  Plaintiff provides no evidence of any statements regarding his protected status made by his supervisors or any other employee at the PPPD.  The only alleged direct evidence of discrimination identified by Plaintiff is when Sergeant Goodwin asked Plaintiff who nominated him for the Shomrim's Society "Man of the Year" award and questioned Plaintiff on why he was receiving the award in a manner that made Plaintiff uncomfortable.  PSOMF ¶ 12.  This remark, taken in context, is completely understandable; Sergeant Goodwin inquired about the source of the award because Plaintiff was required to seek approval to accept awards from outside organizations.  More importantly, this statement certainly could not "mean nothing other than to discriminate on the basis of [Plaintiff's protected status.]". *Fernandez*, 961 F.3d at 1156.  Thus, due to the lack of direct evidence, to survive summary judgment, Plaintiff must establish a *prima facie* case under *McDonnel Douglas*, or point to evidence of a convincing mosaic of discrimination under *Smith*.

### b. Prima Facie *Case*

Under *McDonnell Douglas*, Plaintiff must first establish a *prima facie* case of discrimination by showing: "(1) that [he] belongs to a protected class, (2) that [he]was subjected

to an adverse employment action, (3) that [he]was qualified to perform the job in question, and (4) that [his] employer treated 'similarly situated' employees outside [his] class more favorably." *Id.* at 1220–21.   Here, the City's challenge is limited to elements 2 and 4: whether an adverse employment action occurred and whether Plaintiff has established that PPPD treated "similarly situated" employees outside of Plaintiff's class more favorably.   After carefully reviewing the undisputed facts, the Court finds that although Plaintiff has established adverse employment actions were taken against him, he has failed to establish that similarly situated employees were treated more favorably.   The Court will address each contested element in turn.

### i.   *Adverse Employment Action*

Although not entirely clear from Plaintiff's Response, it appears he alleges three adverse employment actions were taken against him: (1) his transfer from detective to road patrol; (2) the fact he was required to work two of his previously assigned cases after his transfer; and (3) the denial of his application to be a detective in the General Crimes Unit approximately two weeks after his transfer to road patrol.   Although Plaintiff has provided little to no argument as to why these latter two events constitute adverse employment actions, his transfer from detective to road patrol clearly qualifies as such.

Under Title VII, "[a]n adverse employment action is a serious and material change in the terms, conditions, or privileges of employment." *McCone v. Pitney Bowes, Inc.,* 582 F. App'x 798, 800 (11th Cir. 2014) (internal citation and emphasis omitted).   "Generally, an adverse employment action requires a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*   "[T]he employment action must be materially adverse as viewed by a reasonable person under the same circumstances." *Id.*   Under this reasonable person

standard, "[a] transfer to a different position can be 'adverse' if it involves a reduction in pay, prestige, or responsibility." *Hinson*, 231 F.3d at 829.

Here, the undisputed facts show Plaintiff's transfer from detective back to road patrol was an adverse employment action. First, Plaintiff testified the transfer to patrol eliminated his cell phone allowance, uniform allowance, unmarked take home vehicle, a 3% pay increase for working as a detective, and overtime opportunities. PSOMF ¶ 45. While the elimination of these tangible benefits alone is likely sufficient to establish that Plaintiff's transfer from detective to road patrol constituted an adverse employment action, Plaintiff also sets forth several facts which show that road patrol is a less prestigious job than detective.[5] These include social media posts highlighting an officer's "promotion" to detective, as well as a supervisor's comments regarding the risk of being "kicked back to road patrol." PSOMF ¶¶ 43, 68, 90. Thus, Plaintiff has sufficiently established his transfer was an adverse employment action.[6]

---

[5] Given the undisputed facts show that Plaintiff's transfer from detective back to road patrol altered his title, salary and benefits, Defendant's reliance on *Moore v. City of Chicago*, 126 F. App'x 745, 747 (7th Cir. 2005), to maintain Plaintiff "did not suffer an adverse employment action[,]" is misplaced. Mot. at 7. In *Moore*, the United States Court of Appeals for the Seventh Circuit held a city police officer's transfer out of a detective unit did not constitute an adverse employment action for purposes of Title VII because the transfer *did not* alter his title, salary, seniority, or benefits. *Id*. That is hardly the case here as Plaintiff's transfer out of the detective unit clearly had a negative impact on nearly all facets of his employment.

[6] Plaintiff's second argument for adverse employment action—the fact he was required to work two cases he previously worked on as a detective upon his transfer to road patrol—is more aptly characterized as a mere "alteration of job responsibilities." *Vega v. Hempstead Union Free Sch. Dist*., 801 F.3d 72, 85 (2d Cir. 2015) (citation omitted). And even if the requirement of seeing through two additional cases after Plaintiff's transfer were considered an adverse employment action, there is ample evidence in the record this was done due to staffing shortages in Plaintiff's unit and to promote continuity. Thus, the City has "articulate[d] a legitimate, nondiscriminatory reason for its actions" and Plaintiff makes no effort in his Response to meet his burden of showing these reasons are pretextual. *Lewis*, 918 F.3d at 1220-21. In sum, this argument would be unsuccessful under the *McDonnel Douglas* framework. However, the third argument—the denial of his application to be a detective in the General Crimes Unit approximately two weeks after his transfer to road patrol—would appear to constitute an adverse employment action. As failing to promote is well established to be an adverse employment action under Eleventh Circuit precedent, *McCone*, 582 F. App'x at 800, the denial of Plaintiff's application for a detective position after his transfer to road patrol is undoubtedly an adverse employment action under Title VII. *Id*.

### ii. *Similarly Situated Employees*

Although the undisputed facts support the existence of an adverse employment action, Plaintiff cannot show Defendant treated "similarly situated" employees outside of his class more favorably as required by the *McDonnel Douglas* framework.   In *Lewis*, the Eleventh Circuit explained that similarly situated employees must be "similarly situated in all material respects." 918 F.3d at 1231.  This analysis turns "not on formal labels, but rather on substantive likeness." *Id*. at 1228.  Relevant factors include, but are not limited to, whether the individual: (1) engaged in the same basic conduct as the plaintiff; (2) was subject to the same employment policy, guideline, or rule as the plaintiff; (3) was under the jurisdiction of the same supervisor as the plaintiff; and (4) shared the plaintiff's employment or disciplinary history.  *Id*. at 1227–28.

Plaintiff alleges he was not treated similarly to Officers Lopez, Perez, Nader, Martinez, Bryant, and Wilks.  DSOMF ¶¶ 48–60.  The Court will address each allegedly similarly situated employee in turn, beginning with Detective Lopez.   Plaintiff alleges he was not treated similarly to Detective Lopez because, when Detective Lopez's time in the detective bureau was ending, he applied and was given a vacant position within SVU.  DSOMF ¶ 48.  This scenario is easily distinguishable from Plaintiff's.  Plaintiff's position with the SVU was permanent, while Detective Lopez was a rotational detective, meaning he had a two-year commitment.  *Id*. at ¶ 49.  Most importantly, Detective Lopez was moved back to road patrol after the expiration of his two-year commitment—not because of alleged performance issues like Plaintiff.  *Id*.  Indeed, Plaintiff admitted the circumstances surrounding his return to the road and those of Detective Lopez's return, were different.  *Id*. at ¶ 50.  Thus, Detective Lopez's situation was not materially similar to Plaintiff's.

Plaintiff alleges he was also treated differently than Detective Perez, who was promoted to the rank of Sergeant, and who was not required to take open cases with him.  *Id*. at ¶ 51.  The facts

as to Detective Perez are disputed; Sergeant Goodwin was Detective Perez's supervisor at the time he was promoted to Sergeant, and she testified Detective Perez took several open cases with him upon being promoted. *Id*. at ¶ 52. However, Plaintiff testified Detective Perez told Plaintiff he was not required to take open cases with him when he transferred out of the SVU. PSOMF ¶ 52. Regardless, being required to complete previous work responsibilities after a transfer of position is not, at least in Plaintiff's case, an adverse employment action. *See supra*, note 6. Further, the treatment of Detective Perez is easily distinguishable as Detective Perez received a promotion and Plaintiff received what he considers to be a demotion, or at most a transfer. Thus, Detective Perez's situation was not materially similar to Plaintiff's.

Plaintiff also alleges he was treated differently than former SVU detective Yalile Nader. DSOMF ¶ 53. Plaintiff testified Officer Nader was having performance issues which led her to request a different unit, and that request was granted. *Id*. Sergeant Goodwin testified Officer Nader is still working on three open SVU cases, although she is no longer in SVU. *Id*. at ¶ 54. Further, she testified that she experienced performance issues with Officer Nader for a shorter period of time, and the issues were less egregious than those experienced with Plaintiff, although Plaintiff disputes this stating "Det[ective] Nader was placed on a formal performance improvement plan . . . , which she remained on following her transfer to general crimes." PSOMF ¶ 55. Once again, being required to complete previous work responsibilities after a transfer of position is not, at least in Plaintiff's case, an adverse employment action. Further, Detective Nader can be distinguished from Plaintiff as she willingly transferred out of SVU. *Id*. at ¶ 53. Thus, Detective Nader's situation was not materially similar to Plaintiff's under *McDonnel Douglas*.

Plaintiff alleges Officers Martinez and Bryant were removed from SVU, went back to road patrol, and had their cases reassigned. *Id*. at ¶¶ 57-59. Apart from the lack of adverse employment action, Officers Martinez and Bryant had different supervisors than Plaintiff, and no information

is provided as to their performance or disciplinary issues, if any. *Id.* Thus, the undisputed facts do not establish Officers Martinez and Bryant engaged in the same basic conduct as Plaintiff, were under the jurisdiction of the same supervisor as Plaintiff, or shared Plaintiff's employment or disciplinary history.

Finally, Plaintiff alleges former SVU detective Renee Wilks is a similarly situated individual who was treated more favorably than Plaintiff. While Officer Wilks has a similar employment history and comparable performance issues to Plaintiff, there is one obvious difference: Officer Wilks left the unit willingly, while Plaintiff was involuntarily reassigned. *Id.* at ¶ 60. Further, the only "more favorable" treatment Plaintiff alleges with respect to Officer Wilks is that her cases were reassigned when she transferred out of SVU (unlike Plaintiff who was required to continue working two cases). As explained above, the retention of cases cannot be deemed an adverse employment action. *See supra*, note 6. Thus, Officer Wilks cannot be considered a similarly situated individual that was treated more favorably than Plaintiff.

### c. *Nondiscriminatory Reasons and Pretext*

Even if Plaintiff were able to establish a *prima facie* case, the City has met its burden of "articulat[ing] a legitimate, nondiscriminatory reason for its actions." *Lewis*, 918 F.3d at 1221 (citing *Tex. Dep't of Cmty. Affairs*, 450 U.S. at 253). Importantly, "[b]ecause the employer's burden is one of *production*—not persuasion—the employer 'need not persuade the court that it was *actually* motivated by the proffered reason[.]'" *Kidd v. Mondo Am. Corp.*, 731 F.3d 1196, 1205 (11th Cir. 2013) (emphasis in original) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (*en banc*)). The City's reason "need only be specific enough so that the plaintiff is afforded a full and fair opportunity to demonstrate pretext." *Id.* (internal quotations and citation omitted).

Plaintiff bears the burden to introduce evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Kidd*, 731 F.3d at 1205 (citation omitted). To show pretext, an employee must confront the employer's seemingly legitimate reason for the adverse employment action "head on and rebut it." *Id.* at 1206 (citation and internal quotations omitted); *see also Calicchio v. Oasis Outsourcing Grp. Holdings*, No. 21-12854, slip op. (11th Cir. Jul. 15, 2022) (holding rebuttal evidence must lead "a reasonable factfinder [to] find the [stated legitimate reason] unworthy of credence."). The plaintiff "cannot succeed by simply quarreling with the wisdom of that reason." *Id.* (citation and internal quotations omitted). A plaintiff may demonstrate an employer's reasons were pretextual by "revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." *Springer v. Convergys Customer Mgmt. Group Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (citation and internal quotations omitted). Critically, "[a] reason is not pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (internal quotations omitted).

Here, the record is rife with legitimate, nondiscriminatory reasons for the adverse employment actions taken by PPPD against Plaintiff (*i.e.* his transfer to road patrol and the denial of his transfer back to a detective position two weeks after his prior transfer). With respect to his transfer to road patrol, Plaintiff's supervisor, Sergeant Goodwin, testified to conversations she had with Plaintiff about his failure to fully investigate cases, his failure to follow the chain of command, and his failure to respect Sergeant Goodwin as his supervisor. DSOMF ¶ 15. Sergeant Goodwin testified that in late 2018, she began having issues with Plaintiff on a more regular basis. *Id.* at ¶

17.   Sergeant Goodwin also testified that starting in late 2018 and continuing through 2019, Plaintiff's attitude towards her significantly deteriorated and Plaintiff became very argumentative. *Id*. at ¶ 18.   As early as May of 2019, Sergeant Goodwin informed her superiors she was not happy with Plaintiff's performance and wanted him out of the unit.   PSOMF ¶ 19.   When Plaintiff's performance issues were raised, both Captain Carris and Sergeant Goodwin testified Plaintiff became very defensive, stormed out of a meeting, slammed a door, and proceeded to kick another door open.   DSOMF ¶ 21.   Although Plaintiff denies kicking the door, he indicated he verbally disagreed with Sergeant Goodwin's critiques.   PSOMF ¶ 21.   At subsequent meetings, Sergeant Goodwin and Captain Carris raised performance issues including, but not limited to, (1) if Plaintiff felt a case did not require his time then he would come to conclusions without conducting a thorough investigation; (2) issues with Plaintiff skipping the chain of command; and (3) Plaintiff failing to keep Sergeant Goodwin informed of ongoing investigations.   DSOMF ¶ 23.

The sole piece of evidence Plaintiff points to, apart from his testimony simply denying he had any performance issues whatsoever, are his performance evaluations.   And while Plaintiff notes he was ranked as "Exceeds Expectations" in the category of teamwork in his 2015, 2016, 2017, and 2018 performance evaluations, PSOMF ¶ 26, Plaintiff's 2019 Performance Evaluation raises performance issues consistent with those testified to by Sergeant Goodwin and Captain Carris.   PSOMF ¶ 25.   Further, this is consistent with Sergeant Goodwin's testimony that Plaintiff's performance issues began in late 2018.   DSOMF ¶ 17.   Thus, positive evaluations in the four years preceding Plaintiff's performance issues are not enough to dispute the testimony of multiple individuals, much of which was contemporaneously documented by notes on file.   In sum, the facts certainly do not show that Plaintiff has confronted PPPD's legitimate reasons for transferring him "head on and rebut[ted] [them]."   *Kidd*, 731 F.3d at 1206.

These undisputed facts paint a picture of a detective who regularly engaged in insubordination and was unwilling to accept the critiques of his supervisor.  More importantly, the factual record clearly establishes serious performance issues existed, which is the stated reason for Defendant's decision to move Plaintiff to road patrol.  The non-discriminatory reasons behind PPPD's decision not to give Plaintiff a detective position in another section, two weeks after he was told he would be moved to road patrol, are even more obvious.  Defendant's stated legitimate and non-discriminatory reason Plaintiff was told he could not transfer to a detective position was his transfer to road patrol was pending; thus, he was ineligible for the position.  DSOMF, *Exhibit B* at 91.  Finally, Plaintiff makes no attempt to prove or point to evidence that these clear, obvious, and non-discriminatory reasons were pre-textual.  Thus, even if Plaintiff were able to establish a *prima facie* case, he would fail at the second stage of the *McDonnel Douglas* analysis.

### d.  *Convincing Mosaic of Discrimination*

When the *McDonnell Douglas* path is foreclosed, a plaintiff may nevertheless survive summary judgment if she can "present[] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Johnson*, 858 F. App'x at 310.  Under the *Smith* framework, "a triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker."  *Id*. (alterations omitted).  A "convincing mosaic" is established by "pointing to evidence that demonstrates (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly-situated employees, and (3) pretext." *Johnson*, 858 F. App'x at 310 (internal citations omitted).

Based on the undisputed factual record, Plaintiff has not shown a triable issue of fact exists by presenting a convincing mosaic of discrimination.  Plaintiff has not presented any evidence of

suspicious timing as he was transferred to a detective position in 2014, seven years after he came out to his colleagues as gay.  DSOMF ¶¶ 1, 2, 4, 5.  Further, he served in that position, as a gay Jewish man, for five years before he was transferred back to road patrol.  *Id*.  The timing of Plaintiff's transfer in no way implies the transfer was due to his religion or sexual orientation. Instead, it correlates directly with Plaintiff's performance issues as testified to by his supervisors.

Further, Plaintiff has failed to present any evidence of ambiguous statements that could be taken to form a convincing mosaic of discrimination.   Plaintiff presents no evidence of statements related to his religion and the only statement he points to regarding his sexuality is Sergeant Goodwin asking him who gave him a "Man of the Year" award and why they gave it to him. PSOMF ¶¶ 9, 11.  While this comment, taken out of context, could be construed as discriminatory in nature, the fact Plaintiff was required to seek his supervisor's approval, DSOMF ¶ 10, to accept the award for an outside organization clearly outweighs what little animus can be found in such a remark.

Finally, as explained above, Plaintiff has not provided any evidence whatsoever that non-Jewish, heterosexual employees were treated better than similarly situated gay or Jewish employees.  In fact, Defendant has provided systemic evidence to the contrary in terms of sexual orientation as the PPPD currently has a major in the command staff that is openly gay, and there is a supervisor within the PPPD who is also gay.  DSOMF ¶ 65.  Additionally, Sergeant Goodwin's current supervisor, Captain Feiner, is Jewish and is part of the PPPD command staff.  *Id*. at ¶ 66.

In sum, Plaintiff has failed to "present[] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent[,]" and summary judgment must be granted as to Defendant's FCRA and Title VII discrimination claims.

## II.  Title VII and FCRA Retaliation

In addition to prohibiting discrimination, Title VII prohibits retaliation against an employee for the employee's opposition to "any practice made an unlawful employment practice by Title VII." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citing 42 U.S.C. § 2000e–3(a)). As with Title VII discrimination claims, courts "analyze retaliation claims that are based on circumstantial evidence according to the *McDonnell Douglas* burden shifting framework." *Smelter*, 904 F.3d at 1293.  A plaintiff must establish a *prima facie* case of retaliation, which shifts the burden to the defendant "to produce legitimate reasons for the adverse employment action[,]" and, "[i]f the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Shannon v. Bellsouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (citation and internal quotations omitted).

"To establish a *prima facie* case of retaliation, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1258 (11th Cir. 2012) (citation and internal quotations omitted). Here, Plaintiff has failed to establish a *prima facie* case of retaliation.  The Court will address each element in turn.

### a.  *Statutorily Protected Activity*

Plaintiff claims he engaged in statutorily protected activity (1) at two meetings, one in June of 2019 where he told Captain Carris and Major Stasio he felt he had a target on his back, and one in November of 2019 at a meeting called by Sergeant Goodwin where he told her he felt he was being targeted and harassed; and (2) by filing his EEOC complaint.[7]  As explained below, the

---

[7]  Plaintiff's Statement of Material Facts indicates that he met with his union representative, Detective Scott Kushi, and told him he was feeling discriminated against because of his sexuality and religion.  However,

former cannot be considered a statutorily protected activity for purposes of a retaliation claim, while the latter qualifies.

"A plaintiff engages in statutorily protected activity when she opposes an employment practice that she has a good faith, reasonable basis to believe is unlawful." *Diamond v. Morris, Manning & Martin, LLP*, 457 F. App'x 844, 846 (11th Cir. 2012). Protected activity includes opposing unlawful employment practices or participating in any inquiry regarding an unlawful employment practice. *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 & n.4 (11th Cir. 2010). Courts commonly refer to the two provisions of Title VII which prohibit retaliation based on these actions as the "participation" and "opposition" clauses. *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171 (11th Cir. 2000). The "participation clause" protects an employee from retaliation if that employee "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII or the FCRA. *Id.* at 1174. The "opposition clause" provides that an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII or the FCRA]." *Id.*

With respect to opposition clause claims, "[a] plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008).[8] Further,

_____

Plaintiff fails to mention this conversation in his Amended Complaint or argue it is statutorily protected activity in his Response. *See generally* Am. Compl.; Resp. While it is unlikely this conversation with a union representative would constitute participation activity under Title VII, *Griffin v. Gen. Elec. Aviation*, 545 F. Supp. 3d 1232, 1239 (M.D. Ala. 2021) ("Plaintiff's union activity is not statutorily protected activity for purposes of Title VII"), there is no evidence this meeting, or Plaintiff's sentiments expressed at it, were ever discussed with Plaintiff's supervisors. Thus, this claim, if properly pled and supported by the facts, would nevertheless fail on numerous grounds.

[8] The Eleventh Circuit has not squarely addressed if participation clause claims require the dual objective/subjective inquiry required for opposition clause claims. *See Booth v. Pasco Cnty., Fla.*, 829 F. Supp. 2d 1180, 1199 (M.D. Fla. 2011) (explaining the state of the law and collecting cases). However,

"vague references to different treatment" without explaining the basis on which a plaintiff believes they are being treated differently, does not satisfy the requirements of the opposition clause and, therefore, does not constitute protected activity. *Blow v. Virginia Coll.*, 619 F. App'x 859, 863 (11th Cir. 2015).

Here, Plaintiff's statements to his superiors that he felt he was being targeted and harassed, and had a target on his back—without any reference to his religion or sexuality—is a textbook example of a "vague reference[] to different treatment" that cannot constitute protected activity. *Id*. Indeed, in *Blow*, the plaintiff had four separate and documented conversations with her supervisors; however, the court noted that in "none of these instances did she even mention [her protected status], much less contend she was being treated differently *because* of her [protected status]." *Id*. (emphasis added). Specifically, the plaintiff in *Blow* expressed a "general concern . . . about being singled out/treated different" in her job and said she felt "as though the rules of the company are only directed to certain people." *Id*. The court concluded this was not enough to constitute protected activity. Here, Plaintiff admits he did not state he was being harassed or targeted *because* of his protected status. DSOMF ¶¶ 31, 33. Accordingly, his comments to Sergeant Goodwin, Captain Carris, and Major Stasio do not rise to the level of statutorily protected activity.

On the other hand, Plaintiff's EEOC charge undoubtedly constitutes protected activity. *See Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 777 (11th Cir. 2014) (plaintiff's "EEOC Charge constituted protected activity."). Thus, to establish a *prima facie* case of retaliation,

---

because Plaintiff's retaliation claim is insufficient in other respects as explained *infra*, the Court declines to weigh in on the issue and agrees with other district courts that the filing of an EEOC complaint constitutes statutorily protected activity. *Id*.; *see also Wesolowski v. Napolitano*, 2 F. Supp. 3d 1318 (S.D. Ga. 2014) ("a plaintiff is not required to establish that he had reasonable good faith belief that employer was engaged in unlawful employment practices, in order to establish a prima facie case of retaliation under Title VII's participation clause.").

Plaintiff must show that he suffered a materially adverse action and there was a causal connection between his filing of the EEOC charge and that specific adverse action.

### b.   *Materially Adverse Action*

To prove that an action was materially adverse, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted).  As a reasonable detective would certainly be dissuaded from making a charge of discrimination if it meant he would be transferred to a less desirable or prestigious position, Plaintiff's transfer from detective to road patrol clearly constitutes a material adverse action for purposes of a Title VII retaliation claim.  *See Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008).  The same can be said for Plaintiff's claim that he was retaliated against by not being considered for a detective position after his transfer to road patrol.  As previously explained, failure to promote constitutes an adverse employment action since a detective role, at least at PPPD, is a more prestigious position with more tangible benefits.  Additionally, a reasonable road patrol officer would certainly be less likely to make a charge of discrimination if they believed it would harm their ability to be transferred to a better position.  *Id.*  Thus, Defendant has established the materially adverse action requirement of his *prima facie* case.

### c.   *Causal Connection*

To establish a causal connection, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999).  Indeed, this permissive causal connection requirement is likely to be established "where there is a 'close temporal proximity' between the time an employer learns about protected activity and the adverse employment action."  *Moore v. Hillsborough Cnty. Bd. of Cnty.*

*Comm'rs*, 544 F. Supp. 2d 1291, 1306 (M.D. Fla. 2008) (citing *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

Here, Plaintiff fails to establish a causal connection for one key reason: all materially adverse actions that were taken against him occurred *before* he engaged in any statutorily protected activity. Indeed, Plaintiff was informed that he would be transferred from detective to road patrol on November 21, 2019, DSOMF ¶ 38, and his application for detective was denied at some point between December 4 and December 9, 2019. PSOMF ¶ 94. It was not until December 12, 2019, that Plaintiff filed a Charge of Discrimination with the EEOC. DSOMF ¶ 46. Thus, no comparator cases or complex analysis is required to show that the adverse actions had no causal connection to Plaintiff's statutorily protected activity. In this case, a causal connection is a temporal and logical impossibility. Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation and summary judgment must be granted on Plaintiff's Title VII and FCRA retaliation claims.

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendant's Motion [ECF No. 40] is **GRANTED**. Summary judgment is hereby entered in favor of Defendant on all counts. All other pending motions are **DENIED as MOOT**. Final judgment will be entered by separate order. The Clerk is directed to **CLOSE** the case.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 15th day of July, 2022.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**